**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                                  No.  CR 04-701 MV

VICKY T. LEE,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant's Motion for Downward

Departure, filed August 26, 2004 **[Doc. 11]**.  The Court, having considered the motion, briefs,

relevant law and being otherwise fully informed, ruled at the sentencing hearing that the motion

would be **GRANTED**.  The Court now sets forth the basis for its prior ruling in this

Memorandum Opinion.

## BACKGROUND

In September 2002, the Eastern Navajo Land Office became aware of five checks paid to

the office that were never received or deposited.  In attempt to trace the checks, the Land Office

interviewed Vicky Lee ("Defendant"), who the was the office secretary at the time.  Defendant

admitted that she cashed the five checks, totaling $27,498, for her own use.  She also admitted

that she converted other funds received at the Land Office for her own use and the use of the

office.  Defendant was placed on administrative leave and the FBI initiated an investigation.  The

course of the investigation revealed that Defendant had been accepting payments at the Navajo

Land Office and then had been depositing them into an account for Dalton Pass Headstart, where

she served as treasurer.  The total amount deposited to the Dalton Pass account over the course of the offense conduct was $105,081.27.

Defendant's mother abandoned her and her siblings in approximately 1972.  Shortly after that, Defendant's father began to abuse alcohol and left the children to remarry.  As a result, when she was only twelve years old, Defendant was forced to become a parent to her younger siblings.  While Defendant's grandmother assisted with raising the children, she was "very mean" and didn't care for the children appropriately.  Defendant states in a letter to the Court that she remembers coming home one evening to find her sister soaked in dirty diapers.  "I did not like to see them like this so I told my dad I was not going back to school and (sic) to care for them."

Defendant thus was largely responsible for supporting her siblings, both emotionally and financially.  Defendant states that she worked as a silversmith to buy clothing, food, and toys for her siblings.  She also provided hot meals for her siblings each evening, cleaned the house regularly, and helped them with essential chores.  Additionally, she provided the emotional support necessary for them to grow up to be productive and responsible members of society.  As Connie Thompson, one of Defendant's sisters, states in a letter to the Court:

> Like my sister mentioned in her letter we grew up from a
> dysfunctional family since we were at a very young age.  I don't
> really remember much of course I was only eighteen months old
> when my mother left us.  The only thing I could remember is my
> sister taking care of me, she did a pretty good job, I was not sent
> away to a shelter house to be raised by strangers.  I appreciate my
> sister for what she has done for me and my family, she did not give
> up on us, she was a determined teenager to achieve the best care
> possible for all of us. She attended high school during the day, and
> a parent after school.  She would be up all night to finish up her
> jewelry so she could go selling with her uncle on Saturdays.  She
> would always bring miscellaneous items, groceries, clothes, shoes,
> more silver for jewelry; she never came home empty handed.  If she

didn't care we all would have been brought up by other relatives
and probably been alcoholics or drug abuser.

Similarly, Delbert Thompson, Defendant's brother, describes Defendant as a parent in the absence

of their mother and father: "I remember my sister Vicky she took care of us when our parents

divorce (sic), she is our oldest sister and she is a strong individual, she was a parent when our

parents were absent. ... She did a lot during her teen (sic); she took care of us all, even when one

gets sick, she had a way to comfort you and give you aspirin."

Defendant married her husband, David Lee, in 1980.  Defendant, as well as many of her

family members, state that Mr. Lee is an alcoholic and has physically and verbally abused

Defendant for over twenty years.  Mr. Lee has been unable to hold down a steady job because of

his alcoholism.  As a result, Defendant has been the family's sole wage earner. Defendant's son,

Jason Lee, who is 11 years old, has witnessed violence between his parents because of Mr. Lee's

problems with alcohol.  At the sentencing hearing, Defendant testified that her husband "used to

just chase us and – and when he catches up, he would just abuse me, right in front of him

[Jason]."  Furthermore, in the past, Mr. Lee has been verbally abusive to Jason while drunk.

Defendant stated at the sentencing hearing that she was concerned Jason would be neglected and

physically injured if she went to jail and her son was left alone with Mr. Lee.  In addition, she

believes he will relapse.

Several of Defendant's family members also expressed serious concerns if Defendant was

to be separated from her husband and son.  Much of this concern centered on how Mr. Lee will

be able to cope as Jason's sole caretaker.  Defendant's mother, for example, does not have faith

that Mr. Lee will be able to provide Jason with decent care.  She believes that he will start

drinking again.  This concern is echoed by one of Defendant's sisters, Sylvia Morgan, who does

not believe that Mr. Lee will be strong enough to handle being a single parent:  "for sure he does

not have the strength to raise his son alone."   Ms. Morgan believes that Mr. Lee will sell the

family's possessions and relapse.  At the sentencing hearing, Defendant stated that while she may

have family members willing to take care of Jason, she does not believe that he will stay with

anyone but his father.

## DISCUSSION

### A.    Downward Departure

Section 5K2.0 of the United States Sentencing Guidelines (the "Guidelines") provides the

Court with the discretion to depart from the applicable sentencing range if "'there exists an

aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into

consideration by the Sentencing Commission in formulating the guidelines that should result in a

sentence different from that described.'"  U.S.S.G. §5K2.0 (quoting 18 U.S.C. §3553(b)).  In the

instant case, Defendant argued that a downward departure from the sentencing guidelines is

warranted pursuant to Section 5K2.0 based upon prior good works, physical condition, family

circumstances, post-offense rehabilitation, and mental and emotional health.

In determining whether a departure is warranted, "a district court judge may have a better

feel for what is or is not unusual or extraordinary."  *See United States v. Owens*, 145 F.3d 923,

929 (7th Cir. 1998) (citation and quotations omitted).  After consideration of the evidence, the

Court concludes that Defendant's prior good works and family circumstances are present to an

exceptional degree and, in combination, remove this case from the heartland of cases.  In addition,

the Court finds that Defendant's conduct is "utterly inconsistent" with her character as a

responsible mother and citizen. *See United States v. Archuleta*, 128 F.3d 1446, 1450 (10th Cir. 1997) (noting, in its reversal of a downward departure, that the district court "made no finding" that the defendant's criminal acts constituted "a single aberrant episode" or "were utterly inconsistent" with his character). Defendant has no prior criminal history.

## 1.   Prior Good Works

The Court has the discretion to consider prior good works as a basis for downward departure. *See* U.S.S.G. § 5H1.11. The Sentencing Guidelines, however, state that "prior good works are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." *See id.* For that reason, a defendant's prior good works must be extraordinary to warrant a departure. *See Koon v. United States*, 518 U.S. 81, 94 (1996).

When a defendant's "prior good works" are extraordinary and will serve as a basis for a departure is somewhat unclear. Often, courts consider prior good works or charitable community contributions in combination with other factors. For example, in *United States v. Rioux*, 97 F.3d 648, 663 (2nd Cir. 1996), the Second Circuit found that the district court did not abuse its discretion when it granted a downward departure for a defendant with serious health problems, in combination with his record of prior "charitable and civic good deeds." The appeals court stated that "[w]hile many of Rioux's public acts of charity are not worthy of commendation, he unquestionably has participated to a large degree in legitimate fund raising efforts." *Id.*

Courts also have affirmed downward departures for prior good works where the defendant selflessly has helped others in need. In *United Stated v. Woods*, 159 F.3d 1132, 1136-37 (8th Cir. 1998), the Eighth Circuit affirmed a one-level departure for prior good works for a defendant "who brought into her own home two troubled young women," paid for them to go to

a private high school and helped turn them into "productive members of society."  The court refused to disturb the district court's decision where the district court found these efforts to be "exceptional" and the court of appeals had "no basis for holding that they were not."  *Id*. at 1137.

In the instant case, Defendant spent her teenage years doing an extraordinary service for her family and her community -- she assumed the responsibility of raising her siblings after her parents effectively abandoned all of them.  This required Defendant to sacrifice her own youth for the good of her siblings, foregoing school and other teenage activities to work, do chores, feed her siblings, and support them emotionally.  By doing this, Defendant assumed a burden that most other young teenagers cannot imagine.  If Defendant had not relegated her own priorities as a teenager to care for her siblings, they may not be the productive and responsible members of society that they are today.

As such, Defendant demonstrated from a very young age that she is a responsible, caring person and that she is willing to make sacrifices for others in need.  Defendant's substantial contributions to her family are surely the equal of another defendant's civic or charitable contributions, which courts have found to warrant downward departures if present to an extraordinary degree. *See, e.g., United States v. Jones*, 158 F.3d 492 (10th Cir. 1998) (affirming departure based in part on defendant's long history of community service).  For these reasons, the Court finds that Defendant's prior good works on behalf of her siblings and her family are unusual and extraordinary and warrant a departure.

## 2.        Extraordinary Family Circumstances

A court also has discretion to grant a departure based on extraordinary family circumstances.  *See* U.S.S.G. § 5H1.6.[1]  To warrant a departure on this basis, "a defendant must demonstrate that 'the period of incarceration set by the Guidelines would have an effect on the family or family members beyond the disruption to family and parental relationships that would be present in the usual case.'"  *United States v. Rodriguez-Velarde*, 127 F.3d 966, 968 (10th Cir. 1997) (quoting *United States v. Canoy*, 38 F.3d 893, 907 (7th Cir. 1994)).

Although the Tenth Circuit has struggled with when a case is so "unusual" that it is a candidate for a departure based on extraordinary family circumstances, *see United States v. Gauvin*, 173 F.3d 798, 807 (10th Cir. 1999), the court did uphold a downward departure under § 5H1.6 where the following factors were present:  (1) the defendant was the supporter of a wife and four young children; (2) his wife worked 14 hours a day, 55 miles from home in order to replace his income; (3) the children were unsupervised and barely provided for; (4) the family risked losing their car due to inability to make payments; and (5) there was no extended family to support or help with the children.  *Id.* at 808.

Also, in *United States v. Pena*, 930 F.2d 1486 (10th Cir. 1991), the Tenth Circuit affirmed an 8-level reduction for a combination of factors, including family circumstances and aberrant behavior.  The court found that "the defendant's long employment history, the aberrational nature of her conduct, and the fact that two infants would be deprived of support if she were incarcerated" weighed against "the seriousness of the offense, the need to protect the public, the

---

[1] Because Defendant's offense conduct occurred between 1998 and 2002, the Court will employ the 2001 Sentencing Guidelines Manual in its analysis of Defendant's Motion for Downward Departure.

need for punishment, and the goal of deterrence." *Id.* at 1496.

On the other hand, the Tenth Circuit has looked disfavorably on granting downward departures on the sole basis that the defendant is the only provider for his or her children. *See Archuleta*, 128 F.3d at 1451 (reversing downward departure where defendant was sole provider for his children and caretaker of diabetic mother); *Rodriquez-Velarde*, 127 F.3d at 967 (surveying the law in other circuits and determining that "a defendant's status as a single parent does not constitute an extraordinary family circumstance warranting departure"); *United States v. Webb*, 49 F.3d 636, 638-39 (10th Cir. 1995) (finding that "defendant's role as a 'sole caretaker' and the child's need 'to be taken care of'" did not render case extraordinary such as to warrant a departure).

In the instant case, however, the issue is much more grave than whether Defendant is the sole provider for her child. The issue is Jason's safety if Defendant is incarcerated and left alone with Mr. Lee. It is clear to the Court that Mr. Lee has a long history of abusing alcohol and his wife. While it does not appear that Mr. Lee has ever abused Jason, Mr. Lee has abused Defendant in front of Jason. Furthermore, Defendant's family members seem certain that Mr. Lee will be unable to handle the demands of single parenthood and may relapse to his abusive tendencies.

While Defendant stated that other family members may be able to care for Jason, Defendant strongly believes that Jason will not want to live with anyone but his father. In addition, there is no reason to believe that Mr. Lee would allow Jason to live with anyone else but him. The Court finds that these circumstances combine to create a very dangerous environment for Jason should Defendant spend time in jail. In this way, Jason is "uniquely dependent" on

Defendant maintaining her existing "emotional commitment[]" to him, as Defendant has stated that she is much closer to Jason than he is to Mr. Lee. *See United States v. Faria*, 161 F.3d 761, 762 (2nd Cir. 1998) (quoting *United States v. Sprei*, 145 F.3d 528, 535 (2nd. Cir. 1998)). For the reasons stated herein, the Court finds that Jason's physical and emotional well-being would be placed in serious jeopardy if Defendant is incarcerated. The specific risk of physical harm places the instant case outside of the heartland of cases. While "[a]ll families suffer when one of their members goes to prison," *see United States v. Shortt*, 919 F.2d 1325, 1328 (8th Cir. 1990), Jason should not have to be exposed to potential physical abuse or neglect because of Defendant's incarceration. Thus, the Court finds that, in conjunction with her prior good works, Defendant's extraordinary family circumstances warrant a modest departure.

> **3.    Degree of Departure**

In addition to explaining the grounds for a downward departure, the Court must also "specifically articulate reasons for the degree of departure using any reasonable methodology hitched to the Sentencing Guidelines, including extrapolation from or analogy to the Guidelines." *United States v. Goldberg*, 295 F.3d 1133, 1138 (10th Cir. 2002) (citations omitted). In this case, the Court has contemplated the fact that prior good works and family circumstances are discouraged factors under the Guidelines. When a discouraged factor exists, it may serve as the basis for departure when present to an exceptional degree. Therefore, in exceptional circumstances such as the case before the Court, the Guidelines clearly contemplate the permissibility of downward departures.

The Guidelines do not, however, specifically delineate the proper method for determining the degree of departure, but rather state that the "decision as to whether and to what extent

departure is warranted rests with the sentencing court on a case-specific basis."  U.S.S.G. §

5K2.0.  The Tenth Circuit has required a sentencing court to extrapolate from or analogize to the

Guidelines when determining the degree of departure without providing guidance as to how

exactly this may be accomplished.  *See Goldberg*, 295 F.3d at 1138.  Moreover, a sentencing

court may not justify a degree of departure "by referring to the resulting sentence rather than to

an analogy to the Guidelines."  *Id.* at 1140.  Therefore, the Court cannot depart a certain number

of levels to reach a specific sentence -- for example, to avoid incarceration.

 The Court has seriously studied and considered the basic purposes of criminal punishment

as articulated by the Guidelines.  The Court has weighed the goals of just punishment, deterrence,

rehabilitation and uniformity of sentences against the express contemplation of sentences "outside

the range established by the applicable guidelines, if the court finds that there exists [a]

. . . mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by

the Sentencing Commission in formulating the guidelines that should result in a sentence different

from that described."  U.S.S.G. § 5K2.0 (quotation marks omitted).  Thus, the Court has

considered Defendant in comparison with the many other defendants sentenced before the Court,

and has determined that a two-level departure will incorporate the mitigating factors warranting a

sentence below the guideline range, while properly maintaining the integrity of the basic purposes

of criminal punishment.  With a two-level departure, Defendant faces a sentence of twelve

months, which the Court believes satisfies sufficiently the goals of punishment, deterrence and the

protection of the public.

 Moreover, the decision to sentence Defendant to an offense level of ten (10) represents

this Court's "attempt to predict the sentencing range the Sentencing Commission would have

-10-

established if it had considered the circumstances." *See United States v. Cordova*, 337 F.3d 1246, 1249 (10th Cir. 2003). The Court is convinced that, if faced with a defendant whose prior good works and family circumstances were as exceptional as those of Defendant herein, who has no criminal history, the Sentencing Commission would have set a guideline range of six (6) to twelve (12) months.

## CONCLUSION

At the sentencing hearing on October 14, 2004, the Court granted Defendant a two-level downward departure. The Court has enunciated its findings and the basis for the departure in this Memorandum Opinion and Order. With a criminal history category I and an offense level of ten (10), Defendant faced a guideline range of six (6) to twelve (12) months. The Court placed Defendant on probation for five years with special conditions. The Court also ordered Defendant to pay restitution in the amount of $103,926.58.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Downward Departure **[Doc. No. 11]** is **GRANTED**.

**DATED** this 4th day of January, 2005.

_____
MARTHA VAZQUEZ
CHIEF UNITED STATES DISTRICT JUDGE

Attorney for Plaintiff:
Norman Cairns

Attorney for Defendant:
Benjamin Gonzales